UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LJILJANA SOVULJ, as executrix of the estate of
NEDILJKO SOVULJ, and LJILJANA SOVULJ,
individually,

                              Plaintiff,                MEMORANDUM
                                                          AND ORDER
    -against-                                            98 CV 5550 (FB) (RML)

UNITED STATES OF AMERICA, UNITED
STATES BUREAU OF PRISONS,
IMMIGRATION AND NATURALIZATION
SERVICE, DR. ANTONIO BUENDIA, and
DOES 1-5,

                              Defendants.
----------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Plaintiff Ljiljana Sovulj ("plaintiff") moves for an order for an adverse inference. Specifically, plaintiff seeks an instruction that the x-ray film taken on August 11, 1993 would have shown the presence of a tumor in her decedent husband's lung. For the reasons stated below, the motion is denied. However, plaintiff is awarded $1,000 in attorney's fees associated with the spoliation of the x-ray.

## BACKGROUND AND FACTS

        On August 6, 1993, Nediljko Suvolj ("Sovulj"), plaintiff's decedent husband, was incarcerated at the federal correctional institution ("FCI") Schuylkill in Pennsylvania. (See Memorandum of Law in Opposition to Plaintiff's Motion for an Adverse Inference, dated Mar. 21, 2005 ("Defs.' Mem."), at 3; Memorandum and Order, dated July 2, 2003 ("Order"), at 2.) As part of his intake to FCI Schuylkill, Sovulj was examined by Dr. Larry Bartholomew on August 6, 1993. (See Declaration of Assistant United States Attorney Timothy D. Lynch, dated Mar. 11,

2005 ("Lynch Decl."), Ex. A.) At that examination, Sovulj reported that he never had tuberculosis, that he never lived with anyone who had tuberculosis and that he was in good health. (Id.)

On August 11, 1993, Dr. Bartholomew gave Sovulj a complete physical and reported, among other things, that Sovulj's lungs and chest were "normal." (See Lynch Decl., Ex. D.) That same day Sovulj took a Positive Protein Derivative ("PPD") test. (Id., Ex. C.) According to defendants, based on the results of that test, Sovulj was sent to Dr. Antonio Buendia to have an x-ray film taken of his chest. (Id., Ex. E.) On August 14, 1993, Dr. Buendia reported that Sovulj's heart and lungs were normal, and that "no pleural, hilar or mediastinal abnormalities of significance were seen." (Id.)

On March 10, 1994, in preparation for Sovulj's transfer to the federal correctional institution in Oakdale, Louisiana ("FCI Oakdale"), Physician Assistant Pangilnan reported that Sovulj had had a positive PPD test, but that his chest x-ray was normal. (Id., Ex. F.) Sovulj's transfer to FCI Oakdale was effectuated on March 16, 1994. (Defs.' Mem. at 4.) On April 5, 1994, Sovulj complained of coughing, fever, running nose and muscle ache. (Lynch Decl., Ex. G.) Physician Assistant Shalabi examined Sovulj and found that his tonsils were swollen and infected and that his nose was running and red. (Id.) The document also appears to report that Sovulj's lungs were "clear," although the handwriting is difficult to read. (Id.) According to defendants, Sovulj did not return for any further treatment. (Defs.' Mem. at 4.)

On June 13, 1994, Sovulj was transferred from FCI Oakdale to the Federal Detention Center ("FDC") Oakdale where he was held as a detainee of the United States Immigration and Naturalization Service ("INS") until August 1, 1994, when he was deported to

2

the Republic of Croatia. (Defs.' Mem. at 4.) FDC Oakdale is affiliated with FCI Oakdale. On August 31, 1995, Sovulj died of lung cancer, with which he was diagnosed on January 12, 1995, in Croatia. (Lynch Decl., Ex. H; Declaration of Robert A. Skoblar, dated Dec. 16, 2004 ("Skoblar Decl."), ¶¶ 9-10; Order at 2.)

On July 15, 1997, plaintiff filed an administrative tort claim with the U.S. Bureau of Prisons ("BOP"). (Lynch Decl., Ex. I; Defs.' Mem. at 4.) The claim was that Sovulj's death "was caused by the negligence of [Schuylkill] facility and staff." (Id.) Defendants state that plaintiff's claim did not specify a cause of death or provide any medical documentation. (Defs.' Mem at 4.) On August 12, 1997, BOP rejected plaintiff's claim and requested additional information in order to evaluate it further. (Lynch Decl., Ex. J.) In a letter to plaintiff's counsel, BOP stated that it had insufficient information regarding Sovulj's cause of death and provided plaintiff with a "Standard Form (SF)-95" in order for BOP to get more information. (Id.)

On October 20, 1997, plaintiff's counsel supplemented his July 11, 1997 letter by providing BOP with additional information, including a Standard Form 95, an authorization allowing plaintiff's counsel to act on plaintiff's behalf and a certified copy of the death certificate. (Id., Ex. K.) In the Standard Form 95, plaintiff alleged that:

> the death of her husband . . . was caused by the negligence of the
> facility and staff at FCI Schuylkill, Minersville, PA, where
> Nediljko Sovulj was incarcerated. . . . [T]he facility and staff failed
> to render Mr. Sovulj proper medical treatment and failed to
> administer necessary examinations and tests, which would have
> revealed that he suffered from certain diseases which ultimately
> caused his death.

(Id.) On the form, plaintiff does not mention any negligence of FCI or FDC Oakdale. The death certificate, which was apparently sent to BOP, does not indicate Sovulj's cause of death.

3

(Skoblar Decl., Ex. F.)

On March 5, 1998, BOP rejected plaintiff's administrative claim following an investigation, stating:

> During his incarceration, the decedent was given a physical examination, and issued various tests which indicated that he was in good health. There is no evidence that he was suffering from any life-threatening illnesses. . . . The claimant has failed to provide any medical evidence stating the cause of death of the decedent. There is no evidence to indicate that the decedent's death occurred as a result of any negligence on the part of the Bureau of Prisons' staff. Accordingly, this claim is denied.

(Lynch Decl., Ex. L.)

On September 1, 1998, plaintiff brought an action against the United States, BOP, INS and Does 1-5, alleging that the defendants failed to diagnose and treat Sovulj's alleged lung, kidney and pulmonary disorders. (Complaint, dated Sept. 1, 1998 ("Compl."), ¶ 7.) On July 24, 2001, this court dismissed plaintiff's complaint without prejudice because it failed to comply with Rule 8 of the Federal Rules of Civil Procedure. (See Memorandum and Order, dated July 24, 2001.) Specifically, the court found that because it was "unable to ascertain the legal bases for [plaintiff's] claims, or the facts that support them," plaintiff's complaint was "woefully inadequate in satisfying Rule 8." (Id. at 3.) In its order dismissing the complaint, the court gave plaintiff leave to serve an amended complaint within sixty days of the date of service. (See id.)

On September 24, 2001, plaintiff filed an amended complaint alleging that BOP's medical staff had failed to diagnose her husband with lung cancer during his incarceration. (See Amended Complaint, dated Sept. 24, 2001.) Plaintiff alleges that while her husband was incarcerated at Schuylkill between August 6, 1993 and April 19, 1994, prison doctors negligently misdiagnosed him with tuberculosis, failed to give him proper medical exams and mis-

4

interpreted his chest x-ray. (See Memorandum and Order at 2.) As a result, she claims that the doctors misdiagnosed the condition that caused his death. (Id.) On July 2, 2003, Judge Block dismissed plaintiff's claims for negligent medical treatment (time-barred) and the loss of consortium (lack of notice), but allowed her wrongful death claim to go forward because it was filed within the limitations period, and the government was put on a general notice of the claim. (See Memorandum and Order at 6-7.) Judge Block's Order states that the July letter:

> presented the United States with adequate notice of her wrongful death claim . . . . The allegations in the letter, that BOP agents' negligence had caused plaintiff's husband's death, although general, provided sufficient information for the agency to commence an investigation: plaintiff stated a sum certain, and that her husband's wrongful death was caused by the negligence of FCI Schuylkill's staff.

(Id.)

Pursuant to the Freedom of Information Act ("FOIA"), plaintiff requested the decedent's "medical records" from BOP on July 11, 1997.[1] (Skoblar Decl. ¶ 19.) The records were received in or about mid-March 1998; they contained the x-ray report written by Dr. Buendia, but not the x-ray film. (Id.) On December 5, 2000, plaintiff specifically requested the x-ray film. (Id. ¶ 20.) Plaintiff still has not received the x-ray film. Plaintiff now seeks an adverse inference as to the x-ray film, claiming that had it been produced, it would have revealed the existence of decedent's lung tumor.

Defendants contend that radiographic films are placed in an inactive file once inmates are released from federal custody, and separated by year. (Declaration of Spencer

---

[1] Defendants deny having a record of the FOIA request or any responses to it. (Transcript of Civil Cause for Oral Argument, dated June 14, 2005 ("Tr."), at 9.)

Smith, dated Mar. 11, 2005 ("Smith Decl."), ¶ 5; Declaration of John Kostick, dated Mar. 11, 2005 ("Kostick Decl."), ¶ 3.) Further, the Radiologic Technician at FCI Schuylkill states that when an inmate is transferred to another prison, his x-ray is mailed to the receiving institution. (Kostick Decl. ¶ 4.) Kostick infers that the x-rays were probably sent to FCI Oakdale once Sovulj was transferred. (Id. at 6.)

According to Spencer Smith, a clinical supervisory nurse at FCI Oakdale in Louisiana, radiographic films of inmates at FCI Oakdale are filed in numeric order by register number, pursuant to the Bureau of Prisons Program Statement 6000.05. (See Smith Decl. ¶ 4.) Smith states that FCI Oakdale and FDC Oakdale are located on the same institution grounds, and Health Services are consolidated at these two institutions. (Id. ¶ 3.) Smith further states that inactive files are kept for five years, after which they are destroyed. (Id. ¶ 5.) No logs are kept regarding the destruction of x-rays. (Id. ¶ 4.) Smith infers that the x-ray of Sovulj's lung has been destroyed based on his confirmation of BOP's retention policy. (Id. ¶ 6.) According to defendants, BOP would have destroyed Sovulj's x-ray in Oakdale between June 14, 1999 and June 13, 2000. (See Transcript of Civil Cause for Oral Argument, dated June 14, 2005 ("Tr."), at 13 -17.)

Defendants further argue that when plaintiff filed her administrative claim on October 24, 1997, she did not specifically request the x-ray film, and that her claim was so broad that it did not suggest that the x-ray film was needed. (Defs.' Mem. at 10.)

## DISCUSSION

According to the Second Circuit, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending

or reasonably foreseeable litigation." West v. Goodyear Tire and Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). The spoliation of evidence relevant to "proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998). "[A] district court may impose sanctions for spoliation, exercising its inherent power to control litigation." West, 167 F.3d at 779 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43-45 (1991) and Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992)). An adverse inference instruction is one type of sanction a court may impose in response to spoliation of evidence. Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 101 (2d Cir. 2002). Since BOP was the party with control of the evidence and is responsible for the spoliation, the following rulings apply only to BOP and not to the other named defendants in this action.

A.      BOP's Obligation to Preserve the Evidence

A party seeking an adverse inference regarding destroyed evidence must first show that "the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." Kronisch, 150 F.3d at 126. This obligation usually arises when a "party has notice that the evidence is relevant to litigation – most commonly when suit has already been filed . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." Id. Judge Block has already ruled that the United States was given adequate notice of plaintiff's wrongful death claim on July 11, 1997.[2] (Order at 6.) Further, there can be no doubt concerning the existence of the x-ray

---

[2] In addition to the July 11, 1997 letter, BOP also received notice of the x-ray's relevance to reasonably foreseeable litigation by plaintiff's July 1997 FOIA request for decedent's medical
(continued...)

because an x-ray report was furnished to plaintiffs in 1998. (Tr. at 11-12, 36.) Therefore, I find that BOP knew, or should have known that Sovulj's medical records, including x-rays, were relevant to future litigation, especially since the x-ray was taken after Sovulj tested positive for a protein derivative. Defendant's attempt to distinguish Sovulj's medical file from the x-rays on the ground that the x-rays are kept in a different place is unpersuasive.

B.     BOP's Culpability

Second, the party who destroyed evidence must have had a "culpable state of mind." Residential Funding Corp., 306 F.3d at 108. The Second Circuit has held that courts must determine culpability on a case by case basis. See Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 267 (2d Cir. 1999) (explaining that at times, the Second Circuit has required a party to have intentionally destroyed evidence; at other times it has required action in bad faith; and at still other times it has allowed an adverse inference based on gross negligence. In light of this, the Second Circuit concluded a case by case approach was appropriate). "[I]t makes little sense to confine promotion of [spoliation sanctions] to cases involving only outrageous culpability, where the party victimized by the spoliation is prejudiced irrespective of whether the spoliator

---

²(...continued)
records. At oral argument, defendants stated that they have no record of a FOIA request or any responses to such request. (Tr. at 9.) Plaintiff's attorney has subsequently submitted letters from BOP dated July 23, 1997, October 24, 1997, and March 5, 1998, which reference his FOIA request. (Letter of Robert Skoblar, Esq., dated July 11, 2005 ("Skoblar Ltr.").  These three letters from BOP to plaintiff's attorney are additional evidence that defendants were on notice and should have ensured that no part of Sovulj's medical file – including the x-ray – was destroyed given the relevance to likely future litigation. (See Skoblar Ltr.) In the March 5, 1998 letter, BOP wrote to plaintiff's counsel and stated, "[t]he entire medical file" is "releasable to you in [its] entirety." (Id.) The court also noted during oral argument that BOP should have known that the x-ray was relevant to pending litigation when it learned that the cause of death was lung related. (Tr. at 36.)

8

acted with intent or gross negligence." Reilly, 181 F.3d at 267-68. In Residential Funding, the court held that a "culpable state of mind" could mean "knowingly, even if without intent to breach a duty to preserve [the evidence], or *negligently*." 306 F.3d at 108 (internal citations and quotations omitted). In light of the fact that BOP cannot confirm that it even searched the FCI Oakdale warehouse until 2005 (see Smith Decl. ¶ 6), gross negligence could be inferred.[3] Even if defendant's actions do not rise to the level of gross negligence, given that the defendant was on notice of the pending litigation and had a duty to preserve the evidence, BOP was at least negligent in its failure to prevent the destruction of the evidence.

C. Relevance of Destroyed Evidence

Finally, a court must determine "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." Kronisch, 150 F.3d at 127. The burden falls on the "prejudiced party" to produce "some evidence suggesting that a document or documents relevant to substantiating [her] claim would have been included among the destroyed files." Id. at 128. However, courts must take care not to "hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." Id.

Defendants offer the statement of Dr. Anthony D. Blau, M.D., a board certified

---

[3] On July 27, 2004, the government wrote a letter to the court stating that it could not find the x-ray in BOP's archives. (See Letter of Timothy D. Lynch, Esq., dated July 27, 2004.) However, there is no indication that FCI Oakdale was searched and no affirmation was furnished to confirm when and where a search was conducted.

internist, who states that "the inference that [Sovulj's] chest x-ray from 8/11/1993 would have had to have shown an abnormality given the size of the tumor at the time of surgery some 520 days later is unsustainable." (Lynch Decl., Ex. T.) Plaintiff argues that her "expert oncologist has opined that given the size-type of tumor that was examined when the decedent's right lung was removed on February 6, 1995, he would have expected that the tumor would have been visible on the August 11, 1993 x-ray." (Plaintiff's Memorandum of Law in Support of Her Motion for an Adverse Inference based upon the Spoliation of Evidence, dated Dec.16, 2004 ("Pl's. Mem."), at 7.) However, plaintiff does not provide the court with a declaration, affidavit or direct statement from that doctor, nor does she provide the court with the doctor's findings.

Plaintiff's counsel acknowledges that this is a "catch-22 situation;" to obtain an adverse inference, plaintiff must present evidence that the tumor would have been visible on the x-ray, but without the x-ray, plaintiff's medical expert is "not comfortable to say within a reasonable degree of medical certainty" that the tumor would be visible on the x-ray. (Tr. at 38-39.) Therefore, plaintiff cannot meet the requirements for obtaining an adverse inference, since any assertion that the x-ray is relevant is pure speculation. Given that plaintiff has failed to produce *any* evidence to support her claim that the x-ray is relevant to her case, the motion for an adverse inference must be denied.

One of the purposes of an adverse inference is to "restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Kronisch, 150 F.3d at 126. To allow an adverse inference here would not have the effect of restoring the plaintiff to her position absent the destruction of the x-ray, but rather would prejudice the defendant by allowing plaintiff to profit from the destruction of the x-

ray when no evidence has been presented to support such an inference of its contents.

D.      Sanction for Spoliation of Evidence

"[A] district court may impose sanctions for spoliation, exercising its inherent power to control litigation." West, 167 F.3d at 779 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43-45 (1991) and Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992)). A sanction for spoliation of evidence should serve the threefold purpose of "(1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001). In addition to an adverse inference, courts grant various sanctions for spoliation, such as dismissal or monetary sanctions. See West, 167 F.3d at 779; Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 77-78 (S.D.N.Y. 1991). Courts sometimes impose monetary sanctions for the destruction of evidence where an adverse inference is not warranted. See, e.g., Turner, 142 F.R.D. at 77-78; McGinnity v. Metro-North Commuter R.R., 183 F.R.D. 58, 63 (D. Conn. 1998). These sanctions "arise either from the discovery necessary to identify alternative sources of information" or "from the investigation and litigation of the document destruction itself." Turner, 142 F.R.D. at 78.

Given the purpose of sanctions for spoliation and that BOP had an obligation to preserve the x-ray and was at least negligent in allowing its destruction, I find that sanctions are warranted. As previously stated, plaintiff has been unable to produce any evidence that the x-ray would have been relevant to her case, and therefore, an adverse inference is not a proper

11

sanction. However, much of the litigation in this case has centered around the spoliation of the x-ray, and would not have taken place had the x-ray been turned over to the plaintiff after her attorney's original request for the decedent's medical file in 1997. Plaintiff has spent time and money as a result of the spoliation of the x-ray, and in order to serve the threefold purpose of spoliation sanctions, I find that plaintiff should be awarded $1,000 in attorney's fees associated with the spoliation.

## CONCLUSION

For the foregoing reasons, plaintiff is awarded $1,000 in attorney's fees associated with the spoliation of evidence.

SO ORDERED.

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
September 19, 2005